Good morning. My name is Cassandra Stamm and I'm here on behalf of Appellant Rafat Ogedengbe. You had it very very close. With me at council table is Nancy Talner who is here on behalf of her husband, co-defendant and co-appellant Wole Ogedengbe. Our plan is to divide the arguments among us ten minutes per side. I'll be opening with eight minutes and saving two for rebuttal and Ms. Ogedengbe's argument regarding the sentencing procedure and the findings entered by the district court in this case at her sentencing. And the question before this court is in some ways very simple and in some ways very complicated by the recent historical events and the new cases in this area. The baseline question for this court is whether or not the findings of the sentencing court in this matter are sufficient to allow the kind of meaningful appellate review of the sentence and the sentencing procedure that Ms. Ogedengbe received that was contemplated by this court in United States v. Amalime. The district court in this case unfortunately conducted the sentencing hearing in the exact same manner as many, many, many sentencing hearings prior to the court's seminal decision in United States v. Booker. Looking at this sentencing transcript, we have 13 pages of sentencing transcript for two defendants. There is nothing on this transcript to differentiate either the consideration given to the 3553 factors by the district court or the methodology in terms of how those factors were considered and weighed next to the procedure. I find that the base offense level is X and the criminal history category is Y. Therefore, the guideline range is et cetera. This court addressed a very similar situation recently in Diaz v. Argueta. And this is the case that's noted in the supplemental briefing in this case. And the court was very, very clear that subsequent to Booker, subsequent to Amalime, it simply isn't sufficient for the district court to make those kind of findings standing alone. More is required at this point, both because the considerations are mandatory. The statute says the court shall consider. And for that reason alone, the court has to make those kind of findings. But also because this is an area of the law that is, in fact, in flux. Now, are you familiar with Zavala? I am. Obviously, that isn't final. I don't think the mandate is issued at this point. But I don't see this as a Zavala issue in the sense that I don't think that there was any treatment of the guidelines as being presumptive here. And I'm hearing you argue that it's more a 3553 issue. Am I correct in assessing your argument? Mostly, Your Honor. I think that the problem with these findings is that we can't really tell if there is a Zavala issue here or not. If we look at the scant language that we do have in the transcripts of the sentencing in this case, we start with the AUSA arguing to the court, we've looked for reasons to recommend something outside the guideline range. And the court then reverting to this old language regarding departures, which in that kind of language, in that kind of thinking, is addressed in the Zavala case. For many, many years, we all understood a departure to be an extraordinary thing that should only be entered into under limited and compelling circumstances. And the Zavala court says that to hearken back to that kind of understanding and to that kind of language is either to use the guidelines as presumptive, which is not the correct understanding, or to give those guidelines too much weight, you know, perhaps not finding them to be presumptive, but giving them too much weight, instead of considering them the way this Court has now ordered that they be considered as just one factor among many. So to get back to Your Honor's question, if we do try to look at the findings that we have, even though there's not much, it does look like there may have been a Zavala problem here. At base, we can't say for sure. We can't say for sure what was going on in the district court's mind. One of the few things that the court does say is the court talks about, well, if I were going to give you any consideration here, one of the things that would be about family, but the way that I see it here, even if I went down to 10 years, your son would be 24 at that point, because apparently the couple had a 14-year-old child at the time, correct? Yes, that's correct. So, you know, the court did look to that, did consider family, I think, on some level, but decided, well, I don't, you know, I don't see that as really being compelling enough to make a difference here. Well, and that's the key, is what is that reasoning compelling enough to make a difference? The language the court uses when the court makes that statement about, you know, even if I could, I couldn't get down low enough to give you any real help on that Based on what we have here, it's certainly, certainly from the defense perspective, we would argue that's it. That's what the Zavala court was talking about. That's not where we're supposed to be in this era post-Booker and post-Ameline. And there is no presumption that a sentencing court has taken into account all of the relevant factors. And that comes from the other recent case of Diaz, Argueta. And so I think that it's tempting to look at that statement and try to extrapolate from that. Well, certainly he considered something having to do with her family, and maybe that could be fairly taken as the characteristics of the defendant, and on and on and on. But Diaz, Argueta doesn't allow this court to do so. The Diaz court Well, let me ask you this, though, just as a sort of a housekeeping. Do you concede that we must review the district court sentence for plain error since the I do. Okay. But I think there it's important to separate out the arguments that we're making about the findings. The Zavala portion of that argument, the question of not only did the court consider these factors, but how did the court consider and how did the court weigh them, that's reviewed de novo because it's a question of law. And that's the way that the Zavala court addressed that issue and that opinion. When the court sentenced Ms. Ogdenvy, it should have been made clear on the record both that the court considered these factors and that they were considered in a way that held them alongside the advisory guideline calculation. You only have one minute before you're at your eight, just so that you know that. Thank you, Your Honor. Because I don't want you to use counsel's time, your co-counsel's time. And I don't intend to do that. I will address Ms. Ogdenvy's other argument regarding the expert testimony if I have time when I come back. One other thing that I did want to emphasize on this point, though, is that there is really nothing particularly remarkable about this argument. It is the same argument that this Court has applied in other formerly much more familiar circumstances having to do with the mandatory considerations under the That was addressed in United States v. Taylor by the Supreme Court and United States v. White by this Court. And the Court made the rather unremarkable finding and holding that should apply in this case as well, which is that if we don't have it on the record, we can't tell that it happened. And that is the problem. I will allow Ms. Taylor her time. Thank you. Thank you. Hey, police and court. My name is Nancy Talner, and I'm representing Mr. Ogdenvy, Wally Ogdenvy. I would like to reserve four minutes for rebuttal, as my co-counsel indicated. The issue that I'd like to address today out of the several in the brief is the violation of Mr. Ogdenvy's confrontation rights when the government was allowed to use the co-defendant's out-of-court statement to the police as evidence against him at the trial. The question is whether the out-of-court statements in issue here fit the role of the Crawford case. Crawford said when police interrogate a witness out of court for the purpose of later using it as evidence against the defendant, then we're dealing with a testimonial assertion that raises possible confrontation violations. Well, I think if you want to jump to the issue on the Crawford thing, where we'll be looking, is were they offered for the truth of the matter? Does it have to be that? Well, that's correct, Your Honor. That is the issue in the case. But I think it's important to recognize, and even the government concedes in this case, that this was testimonial assertions, and so it fits within that part of Crawford being police interrogation and certainly for the purpose of later using at trial. Then the question becomes whether there's some exception to the Crawford rule, something Crawford said that takes it out of that rule, that otherwise if it meets those things, there has to be an opportunity for cross-examination. And our position here, Your Honor, is that simply looking at that one sentence in footnote 9 from Crawford that makes a reference to a non-hairsay purpose, that isn't enough to apply to this case and say there was no confrontation violation. So is it your position that Crawford governs false statements as well as the statements offered for their truth? Your Honor, in the circumstances of this case and on this record, we do submit that the false statement we acknowledge that the statements of the co-defendant down in court declarant were false and were offered not for the truth, but because they were false. But we submit on the circumstances of this record that it still fits within the Crawford rule that the what the confrontation clause means is that those kind of statements and the way they were used in this case against my client required cross-examination that didn't occur. So if we were to buy your argument, we'd be extending what the case law is right now, exactly, wouldn't we? I don't believe so, Your Honor. We submit that not only under the all of Crawford. You're saying something that no one's ever exactly said before. I think that it's correct that no court has dealt with this exact issue post-Crawford and under these applied it to these kind of circumstances. But I certainly think that the Crawford opinion as a whole, combined with this Court's decision in the Nielsen case and in the Wilmore case, as well as the Sixth Circuit's decision in the Pugh case, all of those cases involved the government alleging they could get around the Crawford rule by saying, oh, this has a non-hearsay purpose, again, relying on that footnote 9 in Crawford to say that you don't have to worry about confrontation here, cross-examination, because we're offering it for a non-hearsay purpose. But what those three appellate courts said, which was fully consistent with Crawford and the whole intent and purpose of Crawford, is that that other assertive purpose was not enough to remove the confrontation violation. The Nielsen case, in particular, is persuasive here, since in that case, the prosecutor said that, oh, this doesn't have a hearsay purpose. The out-of-court declarant saying she didn't have access to the safe or the drugs or the defendant did, well, that we're just describing the police procedure. And this Court said, no, we don't agree with that. We don't agree that we can create this giant loophole in Crawford by accepting the government's claim that this had a non-hearsay purpose, when really what it is is the same thing that was going on in Crawford. It's a police interrogation for the purpose of later use at trial. We're trying to elicit statements that we can use at trial and use against both defendants. And so we're going to – we're going to, without having to submit it to cross-examination, we're just going to present that at trial without the witness ever testifying. So I think there's certainly authority in that and in the Pugh case as well for the are not going to be just accepted by the courts. They're going to go with the greater interests that were expressed in Crawford. I think, you know, an important point from Crawford also is its emphasis on departing from Roberts' analysis. The court – the Supreme Court in Crawford said we're not going to allow this – this unpredictable picking and choosing among different kinds of out-of-court statements and somehow, you know, let just about any claim that they're good enough and get that kind of evidence in. The Crawford court said, no, we're going to put a stop to this. We're going to say that the – what guarantees – what the framers meant by guaranteeing reliability was having confrontation and cross-examination. That didn't occur in this case. Instead, the police were allowed to set up a witness to make statements so they could later use them at trial without having to submit to cross-examination. That's exactly what occurred here. It's not the truth or falsity that matters so much as the fact that they were setting it up that way to elicit the statements for the purpose of later use at trial and then, of course, use them against my client. He never had any chance to explore under cross-examination what was her motive, what did she mean, why did she say those things. It was even worse on this record because the prosecutor cross-examined my client when he testified about exactly those kind of things. He wasn't the right person to answer those questions. What needed to happen under Crawford was to have the declarant in court submitted – subjected to cross-examination, but, of course, that didn't occur, and that was the confrontation violation. I'll reserve the rest of the time for rebuttal. All right. May it please this Court, my name is Lawrence Lincoln, and I am an assistant U.S. attorney. I guess I'll start with the Woolley-Okedembe brief. Mr. Okedembe makes four arguments, and I'll try to take them in order. He does talk about the confrontation clause and alleges that the district court violated his confrontation clause rights by admitting the co-defendant's false exculpatory statement. This, even though those statements were not admitted for the truth, he alleges that there was a violation for not having a limiting instruction given at that time. He also talks about insufficient findings regarding obstruction of justice, and finally, argues that the sentence was unreasonably harsh. Turning to the Crawford issue, Crawford – I'd like to talk to you about the wife's case. Yes. Would you like me to start with the wife's case? Yeah. I'd like to talk to you about it. Yes, Your Honor. She was convicted and charged with a conspiracy. She was. Right. You know, I believe, and I think most Americans believe, that marriage is the most important element in our social lives. And yet, here we find the government charging a wife, a marriage, as part of a conspiracy. How do you arrive at that? Maybe she was an aider in the veteran. I can't say that she was or she wasn't. But how can you charge because she was simply married to this guy? It was a conspiracy. Your Honor. Nothing in the record indicates that they talked about the marriage. Nothing in the record indicates that they jointly did anything together. Why does the government want to say that the marriage is a conspiracy? Your Honor, I believe there is substantial evidence of her involvement in this conspiracy. I see. If I may address that point. I want you to speak up. Oh, I'm sorry. I believe that there is substantial evidence of her participation in the same conspiracy. In the vetting, yes. But you charge a conspiracy solely because she was married to the guy. Your Honor, with all due respect, I do not believe that that adequately reflects the record here. We established that, in fact, Ms. Rafat Ogadenbi followed the same travel itinerary as her husband. She contacted the same individuals in Chicago that were connected to her husband. And, in fact, she contacted them by telephone on the very day that the defendant, Wally Ogadenbi, was arrested. Why do husbands do that all the time? I'm sorry, Your Honor. That's a marriage. That may be a marriage. But we also have her actually returning to Seattle and meeting the co-conspirator, Raman Ganayu, who was the individual who arranged for the travel plans in Seattle. And they visited a Seattle travel agency. They purchased... Wait. Factually, when the husband and the wife, she went three weeks earlier on something. So are they traveling to just so that maybe I didn't get something right about the facts. I didn't get them traveling together all the time as when they're doing it. They may be doing the same thing, but they're doing it at different times and then meeting people, other people that are allegedly involved in the conspiracy. Am I right or wrong on that? That's correct, Your Honor. And in fact, there are four couriers that we proved at trial were involved in this conspiracy with the organizers in Chicago. All of them followed the same itinerary. In fact, one of the conspirators, Kudrat, Ishola Kudrat, was in fact a neighbor of the Ogadenbis.  pattern of travel. It had all the earmarks of a drug importation. It involved tickets purchased at the last minute. Unrelated segments of flight to avoid any connections. It involved the... Most people buy tickets at the last minute. So I get it cheaper. Well, actually... Why is that? Actually, we... Why is that a sinful element of a crime because you buy a ticket at the last minute? It's absolutely not, Your Honor, except for the fact that we did produce evidence establishing that oftentimes criminal enterprises of that nature will use cash at the last minute so that there's no paper trail. It's one of the standard... Who says that people buy tickets at the last minute to avoid a detection of a criminal? Why? They do not always, Your Honor. In this particular case... In this particular building, of course, maybe, yes. But this is proof of guilt. It is some element of the proof of guilt that the government established. But it's not ultimately proof of guilt here. We established so much more in this case, Your Honor. We established that there were significant toll records between Ms. Rafat Ogadenbi and the other co-conspirators. We established that she lied repeatedly. Lied about the... She falsely denied taking a trip to Nigeria. She falsely denied buying her ticket. Those falses lie to protect their spouse. That happens all the time. If you love them, you're going to protect them and do everything you can. She didn't lie for them. Your Honor, with all due respect, she didn't just lie about her spouse. She lied about her own trip. She lied about her own activities in this particular conspiracy. And the jury was, in our view, entitled to consider whether or not that was evidence of a scheme, evidence of an effort to conceal a scheme, and specifically evidence of her consciousness of guilt of participation in a scheme and a conspiracy as charged by the government. Of course, we also find Ms. Rafat Ogadenbi at the travel agency in Seattle on her return, meeting the same person who arranged her tickets as with Mr. Wally Ogadenbi. And in that conversation, she does highly suspicious things. She and Mr. Gunayu tell the travel agents, put a fake number down there. We don't want to give an actual number for Ms. Ogadenbi. They pay in $100 bills consistent with the kind of currency that a courier might receive upon finally delivering his or her load. They ask about luggage. Why did they ask about luggage? She had just arrived from Nigeria with her luggage. Why did she need new luggage? Well, because she gave it to Mr. Gunayu. There is substantial evidence of her involvement in this conspiracy. If I may turn, Your Honor, to the Crawford issue because I believe that the Court had some questions about that. As the Court knows, fundamental to the Crawford issue is this notion that it applies where the reliability of the truth of the evidence is at issue. And the Court said specifically the Confrontation Clause does not bar the use of testimonial statements for purpose other than establishing the truth stated. Rafat Ogadenbi's false exculpatory statements were not offered for the truth of the matter stated. They were offered because they were false. And that's exactly what the Court's order recognized. They were offered for the simple purpose of showing consciousness of her guilt in this participation in the scheme and concealment of that scheme. And why that's important is it showed that a scheme existed. And that's absolutely consistent with other circuits. I think the Court asked about whether there were any other post-Crawford decisions on this. In fact, we couldn't find a post-Crawford decision where the Court held that Crawford required cross-examination of a false exculpatory statement. We just couldn't find it. We cited the Trollach case, a Third Circuit case involving a bank robbery, where the girlfriend in the car lied about her and her boyfriend's name and about the source of the money in the car. The Court said, Third Circuit said, Crawford doesn't apply to this because the reliability of the testimony is not at issue. We're not asking you to rely on whether those statements are being true. We cited the Holmes case involving a mail fraud. A lawyer and a county clerk conspired to backdate documents. And the county clerk gave a deposition in which she lied about how that happened. And the Court said, this is admissible, notwithstanding Crawford, because it's not being offered for the truth. It's being offered to show the existence of a scheme. Why do you lie? To conceal a scheme. Therefore, it's evidence of the scheme. The Stewart case, probably the most recent case on this, Martha Stewart and her obstruction trial. Stewart and Bukanovich lied regarding the inkling stock. And the Court held that, and stated in its opinion, the defendants can't have the temerity to argue that Crawford precludes these false statements made to investigators because Crawford expressly confirmed it's not applicable to statements that are not offered for the truth of the matter. This case is the same case. Rafat lied about her travel to Nigeria, her ties to Chicago, who bought her and her husband's tickets, whether she had pre-reserved reservations in Seattle when she arrived, and did she meet anybody in Seattle. She lied about all of those things. And these lies were verbal acts, acts that showed consciousness of guilt and her concealment of a scheme, and they were admissible, notwithstanding Crawford. One of the things that I noted in the defense brief was that she argued that the government shouldn't be allowed in this case to unilaterally declare whether it's being offered for the truth of the matter stated or for some other purpose. But that's not what happened here. In fact, there was a mountain of evidence that these statements were false. No one questioned at trial that these were false. And even if there is some question about whether the government should be allowed to define the purpose of the statement, we have a court to do that. That's what courts do. Well, I think you can say that, but the court's going to have to ultimately decide whether it's offered for the truth or for another purpose. Obviously, I don't think my experience as a trial judge, just because a lawyer told me something, didn't obviously make it true. And I think that's what's so important about the Nielsen case and the Wilmer case, which I've argued in my brief, actually support the government's position. In the Nielsen case, there was no question that that statement was offered for the truth. The girlfriend stated to police she had no access to the safe with meth, but the defendant did. Court had no trouble determining that that was offered for the truth. The government, on appeal, as an alternate argument, said, oh, by the way, we could argue that it came in for a non-hearsay purpose to explain why the police had to break into the safe. But the court didn't have any problems saying, oh, that's an ad hoc rationalization. In fact, that's exactly what the court said. We don't buy that argument. It was offered for the truth because it pointed the finger at the defendant. Same thing with the Wilmer case. There was no question that that was offered for the truth. The wife said in the grand jury that she had seen the defendant in possession of the gun. And this was a case involving a possession, a legal possession of a gun. The court had no trouble finding that that was offered for the truth. And that's because it pointed the finger at the defendant. I'd like to spend some time on the sentencing, on the remand issue. I thought that Counsel Ms. Stamm argued fairly persuasively that the court was pretty cursory in dealing with 3553A in this instance. And we do have Zavala and we do have Diaz-Argueta. And give me your best argument on why this doesn't have to be remanded. I'd be happy to, Your Honor. I don't think it does. And I think I can distinguish those cases. This is, of course, a plain error standard. Well, and she conceded that. I understand that, Your Honor. The standard here is, did the court sufficiently consider that comes right out of Noe's gun sufficiently consider the guidelines and the factors listed in 3553A? And there must be a showing that the court did that. The court nowhere says the district court must mention by name or phrase the factors in 3553A. And, in fact, it went even farther than that and it said there didn't need to be a specific articulation of any of those factors. Well, and I agree with that. I don't think you have to go one, two, three, four, five, you know, five, six, seven or whatever. But this was pretty short. So tell me how the court somehow covered all of these even though it didn't go one, two, three, four, five, six, seven. I'd be happy to, Your Honor. As a background, I'd just point out that the court was well aware of these factors because the brief by the defendant actually mentioned them twice. In any event, the district court, obviously the court has the district court's statements. District court didn't go one after the other. I know, but you can't just say I read the PSR, right? That's not going to be good enough, is it? No, and that's exactly what that, Your Honor, that's exactly what happened in Diaz-Agueda where the court said basically calculated the guidelines and said I've carefully considered the pre-sentence report and the comments of counsel and the memorandum filed on behalf of the defendant. That's all the court said. And, by the way, in Upshaw, said the same thing. I'm not going to be I'm not going to sentence to the upper limit but rather in the mid-range in accordance with the court's customary standards practice. That's all the court said. Here we have so much more. The court the court stated and I think the court was was already mentioned but he said that and you know even if I did depart downward I'd do it on the basis of family obligations but, frankly, I couldn't get down low enough to give her any help. Then he talks about the son and the 10 years Okay, so we talk about the family. And he also talks about but this is just too much heroin to ignore. Your Honor, did he use the particular phrases in 3553A? No. But was he required to consider and did he show that he considered? Yes. By talking about the family obligations he showed that he considered the history and characteristics of this particular defendant. By talking about No, but more than your that's more than your family. You know. I mean, that's also you know, have you committed other crimes? You know. I mean, there's a lot that goes into considering a defendant. Not just do you have kids or, you know, that type of thing. Yes, there is, Your Honor. As far as those other matters he did refer to the justification in the pre-sentence report and if you look at that pre-sentence report it has both aggravating and mitigating facts the seriousness of the offense the denial of involvement the fact that she was a mere courier the criminal history. But I'd also point out that he said this is just too much heroin to ignore. That goes to the seriousness of the offense the nature and circumstances but also goes to the need for just punishment under the circumstances. So I think we cover a couple of bases there as well. He also talked about with respect to Woolley Ogedemi that he needed to depart downward for proportionality purposes. Again, another 3553A standard that is to avoid sentencing disparity. And finally he talked about the guidelines and we can't forget the guidelines are part of this analysis as well. Was this the best record in the world? Of course it wasn't. I would have loved the judge to talk about each of the factors individually. But did this state so much more than Diaz, Argueta and Upshaw? Of course it did. He actually talked about the circumstances of the individuals and I'd also point out he was there. He sat through the trial. He knew what was appropriate in terms of sentencing here and the circumstances of this particular crime. And I'm not aware whether Upshaw and Diaz Argueta actually involved a trial. But this court was well versed in what went on here. Well, it may not be an unreasonable sentence but don't we need more to decide whether it was an unreasonable sentence? I believe the record is sufficient to decide whether this sentence was reasonable under the circumstances. I think as I mentioned that the court did address at least four of the seven factors granted a bit obliquely. Let me ask you this though. Yes, Your Honor. Can I ask one more question? Because it would be going back for, you know, obviously the law has changed since they were sentenced at this. So it's not a situation of, you know, and the guidelines have become advisory. You know, I don't know what is going to be at the time that by the time this person would be resentenced if it goes back. So it's not necessarily, you know, obviously you can't penalize someone for appealing. I know when I was a California judge when three strikes was going on, there were people that when they were facing 25 to life, they could actually get 75 to life if they went back. And there was no problem with that. Well, I'll answer it as candidly as I can, Your Honor. I believe that it would be unlikely that they'd get more time. I believe that it certainly opens up the possibility after the Court reconsiders many of the factors that the Court could. In this particular case, it would likely go back to Judge Kuhnauer. Judge Kuhnauer is an eminently fair jurist and I don't see him giving more time. But could they? Could they? Yes. Yes, I believe they could. I'm just wondering if this falls into the category and I'm going to ask defense counsel when you come back. Be careful what you ask for. I have arguments on every other issue, but I also don't want to take up the Court's time if the Court doesn't have any questions. I may step back early. I think in lieu of the briefing and the comments made, we don't have any further questions. Thank you for your argument. You actually reserved more time and so I guess you have to leave your co-counsel at least a minute and a half. I did want to say one thing about the sentencing issue. We concur that the record was inadequate. Your clients get more if they go back? Your Honor, I think it's impossible to guarantee they wouldn't. However, I think that they certainly both challenged the severity of the sentence. The facts aren't going to change. We know that. But the law has changed. So in terms of constraints that a court could have felt that it had previously, it might be a different situation. I'm wondering, be careful what you ask for in the sense of whether they could get more. I think they could. I understand, Your Honor. I think there is that risk. If there was a remand, it would certainly be a difficult decision to address that risk. But I also think that on the record here, there was a wealth of mitigating factors and really total absence of aggravating factors. I think that would be appropriate to support a remand where the sentence is under 3553A. So we would certainly ask the court to remand both sentences for resentencing and consideration of that. Turning again to the confrontation issue, I think there is a very important reason in this record why, despite the claims of a non- hearsay purpose, despite admission that the statements were being offered for their falsity, not their truth, and that is that there was no limiting instruction given. Despite defense counsel's request for limiting instruction just before jury instructions were given, he made the point, okay, if this is coming in for a non- hearsay purpose, tell the jury that. Nobody did tell the jury that. And, instead, what happened is, as your honor was pointing out, the prosecutor was allowed to argue in closing and the jury certainly understood well before that in addition through the closing argument that it was the wife's lies to the police that were being used as direct evidence against my client as direct evidence incriminating him, making him guilty, just the fact that she made false statements to the police. And, again, in cross examination of my client, the prosecutor made this point, trying to ask him, well, you made false statements differently from true statements and the fact that they were powerfully incriminating evidence doesn't change the fact that they were false and that Crawford specifically says, we're talking about hearsay, something offered for the truth, wouldn't we be really going out on a limb that Crawford hasn't authorized to accept your argument? And directly contrary to what the Third Circuit said in  trial, the case was a single defendant on trial. It's not like a case like here, which was two defendants with the non-testifying codefendant who was the declarant and her statements used as powerfully incriminating as your Honor The other cases that the government has cited are all talking about a very limited kind of situation where something is offered as a false statement. It's not just that it's false that it comes in and avoids the question. That's the factor that's missing in this case in addition to the limiting instruction. Your Honor, I think that doesn't work in this case because it was in questioning by the police after my client's arrest. This was not the existence of a conspiracy. This was in questioning when they knew the game was up. They knew he had been arrested and the drugs found on him. That's exactly the kind of situation Crawford was talking about as the government presenting that in anticipation of using it in trial, putting the declarant on the spot and wanting to use those statements later. So I think this is fully consistent with Crawford and it  sense. I'll just make one quick point in response to the Court's concern about being careful what you wish for. Certainly the defense must always be careful what they wish for on appeal and I think the Court is correct that it is at least a theoretical possibility that this defendant would receive more time on remand. But in this context given the timing of this sentencing I feel very comfortable asserting both that the case should be remanded and that there's a substantial likelihood that there's a reason for that. In this case the defense counsel comes to the court and indicates that she has been silent on her sentencing recommendation and defense counsel says I believe Booker does give you some discretion the U.S. attorney says and then chimes in later that they have searched for a reason to depart from the guidelines and there simply is none in this case and the court responds well I have to agree it is abundantly clear now that there is a lot more than some discretion that comes after Booker and that's the problem in part with these findings is that we have          that there is a lot more in this case and I believe that there is a lot more in          lot more in this case and I believe that there is a lot more in this case and I believe
judges: Ferguson, Callahan, Bolton